# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**DONNA LUCAS KOCH,**

       **Plaintiff,**

**v.**                                                 **Case No.: 2:13-cv-06780**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

       **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable John T. Copenhaver, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-motions for summary judgment and judgment on the pleadings, respectively. (ECF Nos. 11, 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, that the Commissioner's motion for judgment on the pleadings be **DENIED**, that the decision of the Commissioner be **REVERSED,** and

that this case be **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I. <u>Procedural History</u>

Donna L. Koch ("Claimant") filed an initial SSI application on July 27, 2009, alleging a disability onset date of July 1, 2008, (Tr. at 151), due to hand and arm pain, inability to bend or lift, difficulty concentrating, problems learning new tasks, and difficulty walking. (Tr. at 169). The Social Security Administration ("SSA") denied Claimant's application initially on September 9, 2009, and upon reconsideration on January 11, 2010. (Tr. at 82, 87). Claimant did not seek an administrative hearing on her initial application, but instead filed the instant SSI application on May 10, 2011, alleging a disability onset date of May 1, 2001, (Tr. at 154), due to depression, anxiety, back problems, IBS, fibromyalgia, high cholesterol, knee problems, and tendonitis. (Tr. at 213). The SSA again denied Claimant's application initially and upon reconsideration. (Tr. at 90, 104). Claimant filed a request for an administrative hearing, (Tr. at 111), which was held on August 27, 2012 before the Honorable I. K. Harrington, Administrative Law Judge ("ALJ"). (Tr. at 33-77). By written decision dated October 1, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 16-27). The ALJ's decision became the final decision of the Commissioner on January 23, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 5-8). On March 4, 2013, the Appeals Council granted a 30 day extension for Claimant to file a Civil Action. (Tr. at 3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10). Claimant moved for Summary

Judgment, and both parties filed memoranda in support of judgment in their favor. (ECF Nos. 11, 12, 15). Consequently, the matter is fully briefed and ready for resolution.

## II.   __Claimant's Background__

Claimant was 42 years old at the time of her initial application for SSI, and 46 years old at the time of the ALJ's decision. (Tr. at 13, 151). She completed seventh grade and communicates in English. (Tr. at 58). Her prior employment history includes working as a deli worker, deli/cashier, and a plant nursery laborer. (Tr. at 183, 220).

## III.   __Summary of ALJ's Decision__

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the

3

claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, under the fourth step the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the ALJ must ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ

rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

Here, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since May 10, 2011, the application date. (Tr. at 18, Finding No. 1). At the second step of the evaluation, the ALJ

5

attributed the following severe impairments to Claimant: "intervertebral disk disorder of the cervical spine, degenerative disk disease of the lumbar spine, status post fracture right tibia plateau and left patella, and fibromyalgia." (Tr. at 18-20, Finding No. 2). The ALJ considered Claimant's additional alleged impairments of "vitamin D deficiency, irritable bowel syndrome, gastritis, and gastroesophogeal reflux disease (GERD)" as well as "depression and anxiety," but them to be non-severe. (Tr. at 18). Under the third inquiry, the ALJ determined that Claimant's impairments, either individually or in combination, failed to meet or medically equal any of the listed impairments. (Tr. at 20, Finding No. 3). Under the fourth inquiry, the ALJ determined that Claimant had "the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b)," (Tr. at 20-26, Finding No. 4), and was therefore capable of performing past relevant work as a cashier. (Tr. at 26-27, Finding No. 5). Accordingly, the ALJ concluded that Claimant was not entitled to social security income because she had not been under a disability, as defined in the Social Security Act, since May 10, 2011, the date the application was filed. (Tr. at 27).

## IV.   Plaintiff's Arguments

Plaintiff argues that the Commissioner's decision is not supported by substantial evidence because the ALJ (1) failed to appropriately evaluate Claimant's complaints and symptoms relating to fibromyalgia, as required under SSR 12-2p,  (ECF No. 12 at 4); (2) failed to properly account for Claimant's nonexertional limitations in assessing her RFC, (*Id.* at 5); and (3) failed to adhere to the directives of SSR 82-61 and SSR 82-62 when determining whether Claimant was capable of performing past relevant work. (*Id.* at 9).

## V.   Relevant Medical History

The Court has reviewed the transcript of proceedings in its entirety including the

medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Medical Records

#### 1. February 2001 – May 2004

Between February 2001 and November 2001, Claimant was treated on a nearly monthly basis at Primary Care Systems, Inc. with primary complaints of back pain. (Tr. at 501-14). In February 2001, Claimant complained of arthritis in her back, as well as pain and burning. (Tr. at 513-14). She was assessed with a "history of arthritis of thoracic spine" and referred for pain management. (*Id.*). In March 2001, Claimant attended a follow-up appointment, apparently after being admitted to the ER for back pain two weeks prior. (Tr. at 511). Assessment notes are largely illegible, although Claimant appears to have been diagnosed with fibromyalgia. (Tr. at 512). In August 2001, Claimant reported prior diagnoses of arthritis and fibromyalgia, as well as a family history of degenerative disc disease. (Tr. at 507). On physical examination, both her left and right straight leg raise tests were positive at 70° but negative for radiculopathy, with Claimant's tolerance to 90°. (*Id.*). She had "hip ROM with restriction," "SB tenderness bilaterally" and "bilateral piriformis trigger point tenderness" as well as "SI joints with good gap." (*Id.*). Claimant was assessed with back pain, and x-rays of her pelvis, hips, and lumbosacral spine were ordered. (Tr. at 508). Claimant's x-ray results revealed "levoscoliosis of the lumbar spine," but the studies were otherwise negative. (Tr. at 543). In September 2001, Claimant complained of back pain throughout the past year, with pain in her thoracic/L5 area to her legs. (Tr. at 505). Claimant was assessed with lower back pain and "scoliosis on x-ray," and depression. (Tr. at 506). In November 2001, Claimant complained of back pain with no new

changes. (Tr. at 501). Claimant reported that Flexeril helped, denied LE numbness or weakness but stated that she has pain "all the time" and requested medication for the pain. (*Id.*). Examination revealed that Claimant's spine appeared aligned; however, she was positive for loss of lumbar curve, lumbosacral spasm, straight leg raising, and decreased range of motion with pain. (*Id.*). Claimant's reflexes were +2 bilaterally. (*Id.*). Thus, Claimant was assessed with chronic back pain, scoliosis, and muscle spasms in her lumbosacral spine. (Tr. at 502).

Between November 2002 and May 2003, Claimant attended approximately monthly appointments at Primary Care Systems with continued complaints of back pain, knots on her wrists, depression, and anxiety. (Tr. at 484-98). In November 2002, x-ray results of Claimant's lumbar spine, knees, and wrists revealed "minor hypertrophic change, rule out mild scoliosis" in her lumbar spine while there was "no bony abnormality" in either of Claimant's knees or wrists. (Tr. at 498). In January 2003, Claimant attended a 6-week follow-up appointment for knots on her wrists, as well as complaints of pain in her wrists and back. (Tr. at 492). Claimant was assessed with hyperlipidemia, "OA-DJD hands" and tobacco use. (Tr. at 493). In March 2003, Claimant reported feeling "stressed out," depressed, and sad, and described symptoms of crying a lot, having rapid thoughts and concentration difficulties, having poor socialization, anxiety attacks, sleep disturbance, and daily mood swings. (Tr. at 488). Claimant was assessed with depression and fibromyalgia. (Tr. at 489). In April 2003, Claimant reported that she had stopped taking Wellbutrin due to increased nervousness. (Tr. at 486). She also had a poor experience with Celexa, Zoloft, and Paxil, and reported that Neurontin made her feel "high and drowsy." (*Id.*). In May 2003, Claimant complained of difficulty sleeping for two days as well as body aches and

vomiting. (Tr. at 484). Claimant also reported no relief from her depression with Lexapro. (*Id.*). She was assessed with sinusitis/bronchitis, depression, fibromyalgia, and hyperlipidemia, and was referred to Psychiatry for her depression. (Tr. at 485).

Between November 2003 and May 2004, Claimant received only sporadic medical care. (Tr. at 478-83). In November 2003, Claimant reported right hand/wrist discomfort, right foot discomfort, and aching all over. (Tr. at 481). Claimant also complained of feeling depressed, but reported that she had "stopped all medication several months ago." (*Id.*). She was assessed with depression, carpal tunnel syndrome, plantar fasciitis, and hyperlipidemia, and an x-ray was taken of her foot. (Tr. at 482). X-ray results revealed a calcaneal spur on her right foot, but no other abnormalities. (Tr. at 483). In May 2004, Claimant was treated for a left knee injury after hitting a door frame earlier that morning. (Tr. at 476). Claimant reported increased pain with movement and weight bearing. (*Id.*). She was assessed with left knee pain and an x-ray of her knee was ordered. (Tr. at 477). X-ray results of Claimant's left knee revealed "no fractures, dislocations nor bony abnormalities." (Tr. at 478).

### 2. March 2005 – August 2005

Between March and August of 2005, Claimant was treated primarily for pain in her lumbar and cervical spine, as well as hand weakness and tingling. (Tr. at 465-70). She also complained of depression and anxiety, for which she was referred to a psychiatrist. (Tr. at 470).

On March 7, 2005, Claimant was treated by Christine Jones, M.D. at Primary Care Systems with complaints of lower back pain, depression, and numbness/tingling in her hands. (Tr. at 470). Claimant reported having lower back pain for approximately one month, and noted that she had "had some lower back problems in the past." (*Id.*).

9

Claimant also reported feeling very depressed and tearful recently, and noted a longstanding history of depression, as well as increased stressors in her life including a family conflict with her daughter. (*Id.*). Claimant described pain, numbness, and tingling in her hands when typing on a keyboard, as well as some weakness when she picks up a coffee cup or holds a plate, and reported a prior diagnosis of carpal tunnel syndrome, but stated that she had never tried carpal tunnel braces on either hand. (*Id.*). Claimant's physical examination was within normal limits, although she did "have some spinal tenderness over the lower lumbar area." (*Id.*). However, Claimant had "good flexion and extension of her lumbar spine," with "no paraspinal tenderness and no muscle spasms appreciated." (*Id.*). X-ray results of Claimant's lumbar spine were within normal limits, as the vertebral body heights were preserved, alignment was normal, no fracture was seen, and disc space was well maintained. (Tr. at 471). Claimant was assessed with lower back pain, depression, "question carpal tunnel syndrome bilaterally," and hypercholesterolemia. (Tr. at 470). Dr. Jones prescribed Lexapro for Claimant's depression, referred her to Psychiatry, and ordered an EMG on her upper extremities. (*Id.*).

On March 14, 2005, Claimant reported that her lower back pain had "gotten no better since her last exam," and that "occasionally the pain will radiate down her right and left side of her legs to her knees," particularly when slightly flexing her lower back. (Tr. at 469). Claimant described the pain as sharp and fairly constant, and that it occasionally worsened when lifting laundry or otherwise straining her back. (*Id.*). Claimant's physical examination was normal except for pain starting at L1 across her lumbar spine. (*Id.*). Otherwise, she had "full flexion, extension and rotation of her lumbar spine," no scoliosis, no paraspinal tenderness, and no muscle spasms

appreciated. (*Id.*). Dr. Jones assessed Claimant with lumbar pain, and ordered an MRI. (*Id.*). The thoracic spine MRI was "unremarkable" while the lumbar spine MRI reflected "L4-5 left paracentral disc bulge with mild spinal canal stenosis at this level" but "[n]o evidence of frank disc herniation or nerve root impingement," as well as "minimal posterior disc bulge at the L3-4 level." (Tr. at 541-42).

On April 4, 2005, Claimant reported that the medication had not helped the pain, but that it had also not worsened. (Tr. at 468). She complained of "constant pain, approximately 5/10 in intensity" which "occasionally will radiate across to her hips bilaterally and into her thighs." (*Id.*). Regarding her depression, Claimant reported that Lexapro had "significantly helped her moods" and that she was "a lot less tearful" and "sleeping better at night." (*Id.*). Claimant also reported continued hand weakness and numbness. (*Id.*). Dr. Jones assessed Claimant with lumbar pain with mild disc degeneration and mild spinal canal stenosis with L4-L5 bulging disc, carpal tunnel syndrome, and depression, with instructions to follow-up after an EMG study on her hands and a Neurosurgery appointment for her back pain. (*Id.*). On April 11, 2005, Claimant underwent NCS and EMG testing of her hands and fingers, which resulted in a "normal study," although the neurologist noted that "this does not rule out spine/cord lesions that may cause hand numbness." (Tr. at 539-40).

On June 6, 2005, Claimant continued to report significant back pain and "some spinal tenderness with occasional radiation down the left leg and some numbness in her legs," as well as "some upper arm pain" and bilateral upper arm numbness and weakness, continued anxiety and depression, which worsened "secondary to the chronic pain." (*Id.*). Physical examination revealed that Claimant had "full flexion, extension of her cervical spine, however, with significant pain," as well as "some paraspinal

tenderness along the cervical spine and some spinal tenderness at L4 and L5." (*Id.*). Claimant was assessed with lumbar cervical spine pain, for which an MRI was ordered; anxiety and depression, being treated by a psychiatrist; and hyperlipidemia. (*Id.*).

On June 18, 2005, Claimant's cervical spine MRI revealed a "left paracentral disc herniation at C5/6 with compressive sequel," "diffuse disc bulge at C6/7 with mild narrowing of the spinal canal," and "a complex cystic area associated with the right lobe of the thyroid gland," for which "a followup ultrasound of the thyroid [was] recommended." (Tr. at 537-38). On June 27, 2005, Claimant's follow-up ultrasound revealed a "diffuse heterogeneous thyroid gland, compatible with multinodular goiter," and a "2.5 cm cyst within the right lobe with a mural nodule corresponding to the abnormality on recent MRI of the cervical spine," which was "compatible with a benign finding." (Tr. at 535-36). Claimant was diagnosed with a multinodular goiter and cervical spine disc herniation relating to a "left pericentral disc herniation at C5-C6 with a disc bulging at C6-C7 on the cervical spine." (*Id.*). Dr. Jones instructed Claimant to attend a neurosurgery evaluation for her spine. (*Id.*).

On July 12, 2005, Beverly Epstein, M.D. of the West Virginia University Hospital Spine Center issued a therapy prescription and assessed Claimant with "DDD Lumbar and Cervical spin" and "probable myofacial syndrome and possible SI problems." (Tr. at 283). Dr. Epstein ordered "[f]or LB have her do a directional preference program for 1-2 weeks, then do core stabilization exercises" and instructed Claimant to report her progress after three weeks. (*Id.*).

On August 3, 2005, Claimant attended a follow-up appointment with Dr. Jones. (Tr. at 465). Claimant's physical exam was essentially normal, except that she was "still having significant pain on flexion and extension of the cervical spine," although she did

have full range of motion. (Tr. at 465). Claimant was assessed with "herniated cervical disc, herniated lumbar disc with some minimal compression, and lower back pain," and instructed to "try physical therapy for three weeks" and follow up with Neurology afterward. (*Id.*).

Between August 4 and August 16, 2005, Claimant attended four physical therapy sessions at CAMC Sports Medicine & Rehab Center. (Tr. at 285-92). However, by the third visit, Claimant reported feeling "worse since doing exercises" and complained that "they hurt." (Tr. at 287). On August 18, 2005, the physical therapist recommended that Claimant be discharged from formal therapy. (Tr. at 285). Subjectively, Claimant reported that her condition was worsening; rated her pain at 2-3 out of 10, but 9 out of 10 with treatment; and noted difficulty with activities of daily living and gait. (*Id.*). The physical therapist observed that Claimant was "not progressing" and observed that she "had severe pain with each activity that [they] tried, including McKenzie extension," noting that Claimant "could not lay in any position any amount of time." (*Id.*).

### 3. January 2006 – May 2006

Between January 2006 and May 2006, Claimant was treated primarily for back pain. On January 16, 2006, Claimant was treated by Kevin Milam, M.D. of Primary Care Systems, Inc. (Tr. at 464). Notably, Claimant denied weight loss, worsening edema, weakness, increasing numbness, increasing tingle, increasing tremor, seizure activity, melena, depression, anxiety, insomnia, mood swings, and memory loss. (*Id.*). Claimant's physical examination was normal, and "no gait abnormality" was noted. (*Id.*).

Throughout May 2006, Claimant received chiropractic and physical therapy at Glenelg Medical Center. (Tr. at 293-304). On May 9, 2006, x-ray results of Claimant's cervical spine "suggest[ed] muscle spasm" whereas her lumbosacral spine revealed

13

"minimal degenerative changes." (Tr. at 301). On May 11, 2006, physical therapist Barbara Showalter conducted a physical therapy evaluation, in which Claimant reported burning pain in her neck and shoulders which travels from her mid to low back with greater pain on the left side, as well as left hip pain, right hip stiffness, pain in her SI joints and mid back, and headaches. (Tr. at 297). Claimant reported that driving a car and riding a 4-wheeler increased her pain, that reading a book increased her cervical pain, that she was unable to lie flat on her back for a long time, and that she had difficulty getting up after bending over. (*Id.*). She rated her pain at 8 on a scale of 10. (*Id.*). Physical examination of Claimant revealed that her range of motion in her upper extremities, lower extremities, straight leg raise, and cervical spine were within normal limits, but she had diminished spinal flexion and extension, bilateral rotation, and right lateral flexion. (*Id.*). Claimant's strength was within normal limits as to her upper and lower extremities, except that she had diminished strength in her right shoulder abduction, left hip extension, left hip abduction, left hip adduction, and left hamstring. (Tr. at 298). Claimant's cervical strength was within normal limits except for her flexors, while her spinal abdominals were good. (*Id.*). Claimant's posture revealed a "right shoulder drop, rounded shoulders, protruding abdomen, pelvic crests and hips level in standing, [and] normal lordotic curvature." (*Id.*). On palpation, Claimant had "moderate to severe muscle spasms bilaterally" in her "upper, middle and lower trapezius and thoracolumbar paraspinals" and "moderate tightness" in her left rhomboids and subscapularis." (*Id.*). Claimant's gait reflected an "independent, even step pattern" and her mobility was "independent but movement patterns [were] slow and guarded." (*Id.*). Ms. Showalter opined that Claimant's rehab potential was fair, and recommended physical therapy 3 times per week for 8 weeks. (Tr. at 298-99). Claimant attended

physical therapy on May 15, 17, 19, 22, 23, and 26, and June 2, 2006, during which time she continued to experience pain in her neck and back. (Tr. at 293-96).

### 4. January 2007 – March 2008

Between January 2007 and March 2008, Claimant was treated primarily for back and neck pain, although she also complained of gastrointestinal problems and some symptoms of depression and anxiety. In January 2007, Claimant began receiving primary care from Heidi Wehrheim, M.D. of Primary Care Clay. (Tr. at 453-454). On January 5, 2007, Claimant's chief complaints were nerves and worsening back pain. (Tr. at 453). Claimant reported multiple life stressors, worsening symptoms of depression, anhedoniea, increased tearfulness, poor sleep, and poor concentration. (*Id.*). Physical examination was within normal limits. (Tr. at 454). Claimant's mental status exam was also within normal limits, except that her mood and affect were observed as "dysthymic with range, easy to tears." (*Id.*). Claimant was diagnosed with depression, anxiety, and "chronic back pain and multiple medical issues." (*Id.*). Claimant was prescribed Prozac and Trazadone, and a follow-up appointment was scheduled for the following week. On January 16, 2007, Claimant reported neck and left arm pain, which occurred daily and ranged in intensity from 4 to 10 on a scale of 10. (Tr. at 448). Physical examination was within normal limits as to her general presentation, HEENT, neck, respiratory, cardiovascular, abdomen, skin, neurologic, and extremities, but there was tenderness "on all trigger points. Mid thoracic. Severe lumbar spasm," and Claimant's hand grip was "4/5 with pain reported up arm into shoulder/neck." (Tr. at 449). Claimant's mental status exam reflected that her mood and affect were "slightly anxious with full range" and her speech was slightly rapid, but otherwise her orientation, grooming, eye contact, psychomotor activity, thought process, thought content, memory, and judgment were all

normal. (*Id.*). Claimant was assessed with high cholesterol, neck and upper extremity pain, vitamin D deficiency, fibromyalgia, goiter, depression, and IBS (not diagnosed by colonoscopy). (*Id.*). Dr. Wehrheim prescribed Flexeril for Claimant's neck, and instructed her to reschedule with a chiropractor as soon as possible, and to schedule a colonoscopy. (*Id.*).

On March 2, 2007, Claimant was treated for a cold. (Tr. at 443). At that time, she denied experiencing any gastrointestinal problems, and also denied any joint pain, muscle spasms, or joint swelling. (Tr. at 443). Claimant's physical exam reflected that her abdomen was "soft, nontender, nondistended," with no hernia or hepatosplenomegaly noted. (Tr. at 444). Claimant had a normal gait and station, no peripheral edema, and full ROM and strength throughout all four extremities. (*Id.*). Claimant was assessed with left acute otitis media (ear infection), an upper respiratory infection, and mood disorder NOS. (*Id.*).

On March 6, 2007, a CT scan of Claimant's abdomen resulted in a diagnostic impression of "chronic abdominal symptoms of dyspepsia," "diarrhea alternating with constipation most consistent with irritable bowel syndrome," and "evidence of gastroesophageal reflux disease," with the "possibility of inflammatory bowel disease [ ] less likely." (Tr, at 438). Claimant was instructed to proceed with an upper endoscopy and colonoscopy. (*Id.*). On March 15, 2007, Claimant underwent the colonoscopy with multiple biopsies, which resulted in a post-operative diagnosis of "nonspecific gastritis, diverticulosis coli, [and] internal hemorrhoids." (Tr. at 530-31).

On July 25, 2007, Claimant reported that her back pain had remained the same, that she had been "trying to do stretches without exertion," and that wearing a half-centimeter shoe build-up helped somewhat. (Tr. at 434). Claimant reported that her

neck pain caused arm numbness when severe and that her head became heavy, and she also had occasional spasms with headaches. (*Id.*). In her review of systems, Claimant denied any gastrointestinal difficulties. (*Id.*). Claimant's physical examination revealed "spasms and tenderness [in her] cervical [spine] and trapezius B, also lumbar and SI joints," but was otherwise unremarkable. (Tr. at 435-36). Claimant was assessed with cervical and lumbar pain, high cholesterol, vitamin D deficiency, and h. pylori gastritis, with instructions to continue her medication and current care and to follow up in several months. (Tr. at 436).

On July 26, 2007, Claimant's cervical spine MRI results revealed a "C5/6 left paracentral disc bulge which effaces the ventral thecal sac" and a "diffuse disc bulge at C6/7 with unconvertebral joint hypertrophy," which was "not significantly changed from 6/2005" and reflected "no acute abnormalities." (Tr. at 525-26). Claimant's lumbar spine MRI revealed "mild degenerative changes L3/4 and L4/5 intervertebal discs" but "no focal disc herniation or spinal canal stenosis." (Tr. at 527). There were also "facet degenerative changes with facet synovial cist on the right at L3/4" but "no neural foraminal compromise." (*Id.*).

On September 27, 2007, Claimant was treated for back pain, neck pain, and nerves. (Tr. at 431). She was assessed with "depression, adjustment disorder," "neck pain with cervical disc disease and left sided radicular symptoms and arthritis," and "lumbar pain with disc disease and arthritis." (Tr. at 430).

On November 19, 2007, Claimant began treatment at the UHA Pain Clinic for low back, mid back, and neck and shoulder pain. (Tr. at 312-16). Claimant's physical examination was normal as to her general appearance, HEENT, chest, cardiovascular, respiratory, GU, neurological and psychiatric function, except that she appeared

nervous. (Tr. at 314). Claimant had full lumbar range of motion, but with associated pain. (Tr. at 315). She was assessed with cervical herniated nucleus pulposus cervical internal disc disease, and lumbar internal disc disease, and three cervical epidurals were ordered. (Tr. at 316).

On January 23, 2008, Claimant attended a follow-up appointment at Primary Care Clay following an ER visit for chest pain on December 26, 2007. (Tr. at 426). The ER records reflected that her pain was related to anxiety. (*Id.*). Claimant confirmed that she had been experiencing increased stress and insomnia, and indicated that she was "open to seeing psychiatry at this point." (*Id*). Claimant's physical examination was essentially normal. (Tr. at 428). Claimant was assessed with chronic cervical and lumbar back pain, high cholesterol, depression, and vitamin D deficiency. (*Id.*).

Claimant received three cervical epidural steroid injections on January 28, 2008, February 22, 2008, and February 25, 2008, respectively. (Tr. at 307-11). On March 18, 2008, Claimant was treated at the UHA Pain Clinic for chronic neck and shoulder pain. (Tr. at 305). Claimant reported that the injections helped somewhat, but she continued to experience pain in her shoulders, neck, and low back. (*Id.*). Claimant was again assessed with cervical HNP, cervical IDD, and lumbar IDD, all three of which had worsened since her initial diagnosis. (*Id.*). Physical examination revealed "increased pain with bilateral side bends at neck," and bilaterally trapezius. (Tr. 306).

### 5. October 2009 – January 2010

Between October 2009 and January 2010, orthopedic surgeon Quentin Tanko, M.D., treated Claimant for fractured knees, which she sustained in October 2009 as a result of a motor vehicle accident. On October 19, 2009, Dr. Tanko's physical examination reflected that she had "-20 to 30 degree extension lag," could not fully

extend her left knee, and had "flexion greater than 100 on the right" (standard 120°). (Tr. at 404). Claimant was assessed with fracture-tibia-proximal and fracture patella, with "medial plateau fracture on the right as well as left patella fracture" noted. (*Id.*). Claimant was prescribed pain medication and advised that she would be able to put weight on her left lower extremity in the knee immobilizer but that she would not be able to put weight on her right lower extremity. (*Id.*).

On October 29, 2009, Dr. Tanko conducted a preoperative evaluation of Claimant in anticipation of her "open reduction internal fixation of the right tibial plateau and open reduction internal fixation of left patella." (Tr. at 379-81). Claimant's physical examination reflected that she "presented to preadmission in a wheelchair with bilateral leg braces from upper thigh to ankles" but "denie[d] any acute pain." (Tr. at 380). Claimant had a healing lesion on the left side of her forehead and two stitches intact under her chin. (*Id.*). She had "fair range of motion that [was] slightly decreased" in her neck, and "some tenderness in the right lower rib area from some fractured ribs." (*Id.*). Claimant had "bruising behind the right knee" and "two small healed areas on the left knee." (Tr. at 381). Otherwise, Claimant's physical examination was within normal limits. (Tr. at 380-81). Dr. Tanko assessed Claimant with "fractured right tibial plateau, and left patella," hyperlipidemia, anxiety/depression, gastroesophageal reflux disease, and chronic back pain. (Tr. at 381). Claimant's knee operation took place that same day. (Tr. at 382-83).

On November 9, 2009, Claimant attended a post-operative appointment with Dr. Tanko. (Tr. at 403). Physical examination of Claimant's knees was normal. Claimant's staples were removed and replaced with Steri-Strips, while x-ray results "demonstrate[d] excellent alignment on the proximal tibia" with "no screw

micromotion" and "no plate cut out." (*Id.*). X-ray results of Claimant's "left patella demonstrate[d] good position of the screws, less than a few millimeters gaping." (*Id.).* Claimant was assessed with "Fracture Tibia-Proximal – (Primary), Right" and "Fracture Patella, Left," with additional notes indicating "status post ORIF right tibial plateau, left patella, doing fine." (*Id.*). Dr. Tanko instructed Claimant to remain non-weight-bearing on the right, and to use a knee immobilizer on the left with weight bearing as tolerated. (*Id.*). Claimant attended another post-op appointment on December 11, 2009, in which she reported that she had been walking "for at least a couple of weeks," but noted a fall on her left knee and "a lot of swelling over the left knee cap." (Tr. at 402). On examination, Claimant's left knee range of motion was from 0° to 110°, while her right knee ROM was from 0° to greater than 130°. (*Id.*). Her skin was "well scarred in both knees from medial approach to the proximal tibia" and she had "gross sensation intact right vs. left lower extremity." (*Id.*). There was some swelling over the anterior left knee. (*Id.*). Imaging studies revealed that "the right knee demonstrate[d] good position of the plate" with "no screw micromotion, no cut out," whereas her "left knee demonstrate[d] good position of the patella screws," with "no cut out" and "good callous." (*Id.*). Claimant's diagnosis remained unchanged, except that Dr. Tanko noted that her right knee plateau ORIF and ORIF left knee patella fracture were both "doing fine." (*Id.*). Dr. Tanko allowed for "activity as tolerated" and instructed her to use Tylenol or Aleve for pain. (Tr. at 402).

On January 11, 2010, Claimant attended a post-operative appointment in which she reported "grinding left knee pain and pain down the right leg anterior to the right knee and distal to it." (Tr. at 401). Physical examination revealed an "antalgic gait favoring the left side," but was otherwise essentially normal, as were her imaging

studies. (*Id.*). Dr. Tanko assessed Claimant with "Fracture Tibia-Proximal (Primary)" and "Fracture Patella," noting Claimant's knee pain, and instructed Claimant to begin physical therapy with a home exercise program. (*Id.*).

### 6. January 2010 – July 2012

On January 19, 2010, Claimant attended an initial visit at the Charleston Area Medical Center for the purpose of establishing a primary care provider. (Tr. at 625). Claimant complained of increased cholesterol, vitamin D deficiency, depression, anxiety, fibromyalgia, and severe pain in legs since her October 2009 motor vehicle accident. (*Id.*). Claimant reported that her biggest concerns were with leg pain and back pain secondary to her motor vehicle accident and fibromyalgia. (Tr. at 626). Physical examination of Claimant revealed decreased lower extremity strength with decreased range of motion and cracking/popping in her knees. (*Id.*). Claimant was also observed as "slightly anxious/nervous/crying." (*Id.*). Claimant was assessed with chronic pain, hyperlipidemia, depression, anxiety, and fibromyalgia. (*Id.*). Claimant attended a follow-up appointment on January 26, 2010, with complaints of pain in both legs and back. (Tr. at 623). Claimant was assessed with chronic neck pain, for which she was prescribed Percocet and referred to Dr. Walker. (Tr. at 624).

Claimant attended three check-up appointments in 2010. On May 4, 2010, Claimant reported social issues relating to the custody of her grandchild, fighting with her boyfriend, difficulty sleeping, as well as chronic neck pain, and depression/anxiety. (Tr. at 552). Claimant's physical exam reflected "full ROM with cervical neck both passive and active," as well as "TTP around C6-7" and "reproducible tingling." (*Id.*). Otherwise, her physical exam was essentially normal. (*Id.*). Claimant was assessed with chronic neck pain. (*Id.*). Although "no red flags" were observed, it was noted that

21

Claimant had "progressive pain" and a positive MRI in 2007. (*Id.*).  On August 2, 2010, Claimant complained of chronic neck pain, as well as arm/hand numbness and grip weakness. (Tr. at 550). Claimant's neck was supple, although a goiter was observed, while examination of her neurological function reflected "deep tendon reflexes in upper extremity +2 symmetrical," although her strength was "limited by neck pain" and rated 4/5 in the upper extremities. (*Id.*). Claimant was assessed with neck pain, with a history of associated trauma, bulging disc, and radiculopathy noted, as well as hyperlipidemia, fibromyalgia, and obesity. (*Id.*). Claimant was prescribed Savella for her fibromyalgia. (*Id.*). On November 1, 2010, Claimant complained of neck pain radiating to her arms. (Tr. at 548). Claimant also reported that she could not tolerate Savella. (Tr. at 548). Claimant's physical examination was unremarkable, except that she had decreased strength due to pain in all four extremities. (*Id.*). Claimant was assessed with cervical (neck) pain, hyperlipidemia, and a thyroid goiter. (*Id.*).

Between 2011 and 2012, Claimant attended four biannual check-up appointments. On January 3, 2011, Claimant was assessed with neck pain, which was observed as "controlled with Neurontin and Percocet." (Tr. at 546). On May 16, 2011, Claimant complained of chronic back pain and neck pain. (Tr. at 544-545). Her physical examination was normal, except for decreased sensory in the right leg. (*Id.*). Claimant was assessed with a multinodular goiter, "motor vehicle accident with degenerative change lumbar spine with neuropathy," hyperlipidemia and triglycerides. (*Id.*). Claimant received Percocet and Neurontin refills, and was prescribed Zanaflex. (*Id.*). On November 18, 2011, Claimant complained of "knee pain from previous injury," as well as neck and back pain and fibromyalgia. (Tr. at 622). Claimant's physical examination was normal. (*Id.*). She was assessed with fibromyalgia/chronic neck/back pain, for which

she was to "continue previously prescribed Neurontin/Percocet, Zanaflex." (*Id.*). Claimant was also assessed with hyperlipidemia and anxiety. (*Id.*). On April 5, 2012, Claimant complained of neck pain and occasional tingling/numbness, as well as depression. (Tr. at 620). Her examination was unremarkable, and she was assessed with neck pain, although treatment notes indicate that her pain was well controlled on Zanaflex, Percocet, and Neurontin. (*Id.*). Claimant was also assessed with hyperlipidemia and Anxiety/Depression. Treatment notes indicate that after restarting Cymbalta and increasing Neurontin, her mood was improved, she had lost weight, and was talking more with her daughter and boyfriend. (*Id.*). On July 5, 2012, Claimant complained of right arm pain and numbness, as well as bilateral knee pain. (Tr. at 627). Claimant was assessed with anxiety/depression, but noted that she was "doing well" and had "better relationships with daughter, boyfriend." (Tr. at 628). Regarding Claimant's neck/back pain, treatment notes indicate that she was "doing well" and "working more outside." (*Id.*).

### B. Mental Health Treatment Records

On April 8, 2005, Claimant underwent a comprehensive psychiatric evaluation from Marilon Patalinjug, M.D. at Highland Behavioral Health, pursuant to a referral from Dr. Jones. (Tr. at 370). Claimant reported a history of depression dating back to third grade, with most recent treatment taking place in 2003. (*Id.*). Claimant complained of depression, mood swings, poor sleep patterns, increase in appetite, increase in weight, poor energy, poor concentration, anxiety attacks, and occasional suicidal thoughts, but stated that she would not do anything to hurt herself out of concern for her children and grandchildren. (*Id.*). Claimant reported a past history of mental health treatment, first with a psychiatrist from third to sixth grades for

depression and social phobia, and then in 2003 with therapist Barbie Holcomb, with whom she "met for about a month on a weekly basis," after experiencing chest pains which were diagnosed as panic attacks at Thomas Memorial Hospital. (*Id.*). Claimant reported that she had been taking Lexapro for the past four weeks and that she was "beginning to notice how it [was] helping stabilize her mood," but that she still experienced occasional anxiety attacks. (Tr. at 371). Dr. Patalinjug diagnosed Claimant with "major depressive disorder, recurrent" and social phobia and assigned Claimant a GAF score of 55[1] in the past year. (*Id.*). Dr. Patalinjug encouraged Claimant to return to therapy and prescribed Lexaprol and Vistaril for agitation, anxiety, and sleep. (*Id.*). Claimant continued to meet with Dr. Patalinjug approximately bimonthly throughout January 2006.

Between January 2006 and March 2009, there is a three year break in mental health treatment records for Claimant.

On March 26, 2009, Claimant sought an evaluation for depression treatment at Primary Care Clay. (Tr. at 413-16). Claimant reported worsening depression due to family issues, and indicated that Celexa was not helping. (Tr. at 413). Claimant admitted to chronic depression, but denied any current suicidal or homicidal ideations. (Tr. at 414). She also complained of chronic neck and back pain. (Tr. at 413). Claimant's physical examination was entirely within normal limits, including her mood and affect

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. It should be noted that in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned as a measurement tool. A GAF score between 51 and 60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

which were observed as stable. (Tr. at 414).   Claimant was assessed with "depressive disorder, not elsewhere classified," for which she was prescribed Cymbalta in place of Citalopram, and referred to Process Strategies. (Tr. at 415).

On May 15, 2009, Dr. Patalinjug conducted a comprehensive psychiatric evaluation of Claimant. (Tr. at 347). Claimant reported continuing "chronic problems with depression and frequent episodes of panic attacks" as well as associated crying spells. (*Id.*). Claimant described family stressors, as well as other symptoms including sleep difficulties due to neck and back pain and foot cramping, poor energy, passive suicidal ideations, poor concentration when upset, and hypnopompic hallucinations. (Tr. at 347-48). Claimant's mental status exam was entirely unremarkable, except that she "appeared occasionally dysphoric during the interview." (Tr. at 349). Dr. Patalinjug diagnosed Claimant with "Major Depressive Disorder, recurrent, mild" and "Anxiety Disorder, NOS (rule/out Social Phobia)" along Axis I, and assigned her a GAF score of 55. (*Id.*). Claimant's Cymbalta prescription was renewed and she was instructed to follow-up in four weeks. (*Id.*).

On June 12, 2009, Claimant began mental health treatment at Process Strategies. (Tr. at 345-46). Claimant reported difficulties with her husband, as well as chronic pain and back problems. (Tr. at 345). Claimant's mental status exam was within normal limits, except that her mood was observed as dysphoric and she reported that her sleep varies. (Tr. at 346). She was assessed with major depression recurrent and anxiety NOS along Axis I and assigned a GAF score of 50.[2] (Tr. at 345).

---

[2] A GAF of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). On the GAF scale, a higher score indicates a less severe impairment.

On August 21, 2009, Claimant attended a follow-up appointment at Process Strategies, in which she reported experiencing a "stable mood but erratic sleep pattern" and feeling "not as anxious." (Tr. at 343). Claimant's mental status exam was within normally limits except that she reported inadequate sleep and varied energy. (Tr. at 344). "Some improvement" was noted, but Claimant's diagnosis remained unchanged. (Tr. at 343).

On October 16, 2009, Claimant attended a follow-up appointment at Process Strategies in which she reported being in a car accident two weeks prior. (Tr. at 341). Claimant's mental status exam was within normal limits except that she reported varying sleep and energy. (Tr. at 342). Claimant was observed as "stable with Cymbalta," and her diagnosis remained unchanged. (Tr. at 341-42).

### C. Physical and Mental Evaluations and Opinions

#### 1. Physical Evaluations

On July 17, 2008, Claimant's treating physician Dr. Wehrheim completed a physical evaluation for the West Virginia Department of Health and Human Resources Medical Review Team ("DHHR MRT"). (Tr. at 421-25). Examination of Claimant's neck revealed decreased range of motion and posterior spasm with tenderness; her abdomen revealed "mild epigastric and left lower quadrant tenderness" but no rebound/guarding; she had decreased range of motion in her neck, shoulder, and lumbar spine with pain reported, as well as bilateral knee crepitus, diffuse noninflamed arthritic changes of joints, plantar tenderness, diffuse paraspinal spasms, and bilateral tenderness in her SI joints. (Tr. at 422). Dr. Wehrheim also observed that Claimant appeared dysthymic, but would defer to a psychiatric evaluation as to her mental health. (*Id.*). Regarding pain, Dr. Wehrheim noted that Claimant suffers from migraines and headaches 2-3 times per

month, daily neck and shoulder pain, intermittent elbow pain, daily finger pain, frequent thoracic spine pain, daily lumbar pain, intermittent bilateral hip pain worse on the left side, daily knee pain, intermittent bilateral ankle pain, and daily bilateral foot pain. (*Id.*). Dr. Wehrheim diagnosed Claimant with major impairments consisting of cervical disc disease with radiculopathy, lumbar disc disease with radiculopathy, fibromyalgia, depression (refractory), arthritis, headaches, and foot pain due to heel spurs and plantar fasciitis; and diagnosed her with minor impairments consisting of plantar fasciitis, heel spurs, bunion, anxiety, high cholesterol, obesity, diverticular disease, gastritis, and vitamin D deficiency. (*Id.*).

Regarding Claimant's ability to work, Dr. Wehrheim opined that Claimant was unable to work any full-time work because she was "unable to lift, kneel, stoop, [or] squat on a regular basis," she needed to "be able to change from sitting to standing ad lib," and she had "difficulty dealing with public due to mood issues." (*Id.*). Dr. Wehrheim further recommended Claimant avoid "any physically demanding work" and "any that limits ad lib position changes," as well as "any that has prolonged interaction with the public." (*Id.*). Dr. Wehrheim opined that the duration of inability to work full-time would depend "on patient's response to the treatments/care over the next year." (Tr. at 422). Finally, Dr. Wehrheim concluded that Claimant "needs treatment of current issues, especially mood issues before a return to work can be considered." (Tr. at 423).

On July 30, 2009, nurse practitioner Tracie Buner, MSN, FNP, completed a physical evaluation for the DHHR MRT. (Tr. at 406-08). Claimant's physical examination revealed no abnormalities, although she "describe[d] pain in her neck, back and numbness in hands bilaterally." (Tr. at 407). Nurse Buner diagnosed Claimant with

depressive disorder and hyperlipidemia. (*Id.*). Regarding Claimant's ability to work full time, Ms. Buner noted that "patient states there is nothing she can do," (*Id.*), and opined that Claimant should avoid heavy lifting. (*Id.*). Ms. Buner noted that Claimant was "referred to Process Strategies in March 2009, and as of June 2009, Claimant ha[d] not responded to calls from Process Strategies." (Tr. at 408). Ms. Buner further remarked that "based on patient's comments of her inability to do anything, even though encouragement offered to learn a new skill, patient continues to say she cannot work." (*Id.*).

On September 3, 2009, SSA consultative physician, A. Rafael Gomez, M.D., provided a physical RFC opinion of Claimant based upon Ms. Buner's physical examination and recent medical records. (Tr. at 317-24). Dr. Gomez opined that Claimant could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (Tr. at 318). Claimant could occasionally climb ladders, ropes or scaffolds, and could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. at 319). Claimant had no manipulative, visual, or communicative limitations. (Tr. at 320-21). Regarding environmental limitations, Dr. Gomez opined that Claimant should avoid concentrated exposure to vibration and hazards such as machinery and heights, but that she could sustain unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, fumes, and irritants such as fumes, odors, dusts, gases, and poor ventilation. (Tr. at 321). Dr. Gomez concluded that Claimant "is not fully credible" because her MRI reflected that her lumbar DJD was mild, she did not have any neurological deficit, and she was active. (Tr. at 322). Accordingly, Dr. Gomez would

reduce her RFC to medium work. (*Id.*).

On January 8, 2010, SSA consultative physician, Rabah Boukhemis, M.D., provided a physical RFC opinion of Claimant in light of her recent knee surgery. (Tr. at 392-99). Dr. Boukemis opined that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (Tr. at 393). Claimant could frequently balance, stoop, or kneel; but could only occasionally climb, crouch, or crawl. (Tr. at 394). Claimant had no manipulative, visual, or communicative limitations. (Tr. at 395-96). Regarding environmental limitations, Dr. Boukhemis opined that Claimant should avoid even moderate exposure to hazards such as machinery and heights; avoid concentrated exposure to extreme cold, wetness, humidity, vibration, and irritants such as fumes, odors, dusts, gases, and poor ventilation; but that she could sustain unlimited exposure to extreme heat and noise. (Tr. at 396). Dr. Boukhemis found Claimant to be "credible for fractured tibia and patella" but noted that her "injuries [were] healing well." (Tr. at 397). Dr. Boukhemis also noted Claimant's "DJD of the back," and accordingly would limited her to "Light RFC." (*Id.*). Dr. Boukhemis further remarked that Claimant's January 8, 2010 orthopedic follow-up revealed "excellent ROM" and "no complications evident." (Tr. at 399).

On January 4, 2011, Ms. Buner completed her second physical evaluation for the DHHR MRT. (Tr. at 409). Claimant reported that she "can't stand to be around people" because she gets too nervous, and complained of back and knee problems bilaterally, as well as depression and anxiety. (*Id.*). Claimant's physical examination was essentially within normal limits except that her gait was observed as "steady with limp to the left

leg" and Ms. Buner noted a "history of depression treated by Dr. Saddha, Charleston." (Tr. at 409-10). Claimant reported "pain in low back and knees bilaterally." (Tr. at 410). Ms. Buner assessed Claimant with anxiety, depression, and knee pain as major impairments, and lumbago and cervicalgia as minor impairments. (*Id.*).Mr. Buner indicated that "per patient," she was not able to work full time, and elaborated that "patient reports she can't work due to nervousness disorder but cares for grandchildren when needed and worked in several delis until 1999 per patient." (*Id.*). Ms. Buner opined that Claimant should avoid heavy lifting. (*Id.*). Ms. Buner indicated that Claimant should be referred for vocational rehabilitation. (Tr. at 411). In her summary of conclusions, Ms. Buner noted that this was her second encounter with Claimant, and that "based on physical exam only, patient may be able to be trained to do something. Again, this is based on physical exam only. I have no medical records that includes radiology reports or specialists to make any other conclusions." (*Id.*).

On June 17, 2011, SSA consultative physician, Miraflor G. Khorshad, M.D., conducted a physical examination of Claimant. (Tr. at 556). Claimant complained of "crying spells and bad chest pain," and reported that she "does not want to be outside and does not want to see anybody." (*Id.*). She also complained of "aching in her body," "pain in the knees, worse in the left knee," inability to walk for a prolonged time, and "cramping in her legs." (*Id.*). Other alleged symptoms included chronic fatigue, stiff neck, decreased motion to the neck, chronic abdominal pain, nausea, vomiting, diarrhea, constipation, hemorrhoids, weakness, and cold intolerance. (Tr. at 556-57). Physical examination of Claimant was normal as to her general appearance, vital signs, skin, HEENT, neck, chest, lungs, cardiovascular function, abdomen, musculoskeletal function, neurological function, handgrip, visual acuity, and hearing. (Tr. at 557).

Regarding her extremities, Dr. Khorshad observed that both upper and lower extremity muscle strength was graded as 4/5, and that Claimant had a 15 cm scar on the mid-aspect of her right knee and a 16 cm scar on the dorsal surface of her left knee. (*Id.*). Claimant had decreased range of motion as to her bilateral knee flexion-extension, left hip forward flexion, bilateral hip abduction, bilateral hip adduction, left cervical spine lateral flexion, right cervical spine rotation, and lumbar spine flexion-extension. (Tr. at 556-60). Dr. Khorshad diagnosed Claimant with chronic depression, chronic neck and back pain, and traumatic arthritis in both knees. (Tr. at 558).

On June 30, 2011, James Egnor, M.D. provided a physical RFC opinion of Claimant based upon Dr. Khorshad's examination and Claimant's recent medical records, (Tr. at 562-69), in which he opined that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, but must periodically alternate sitting and standing to relieve pain or discomfort, and had unlimited ability to push/pull. (Tr. at 563). Dr. Egnor explained that Claimant required a "sit/stand option every 2 hours as needed for pain relief," but could "us[e] normal breaks for rest periods." (*Id.*). Claimant could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. at 564). Claimant had no manipulative, visual, or communicative limitations. (Tr. at 565-66). Dr. Egnor opined that Claimant should avoid concentrated exposure to extreme cold and vibration, but could withstand unlimited exposure to extreme heat, wetness, humidity, noise, irritants such as fumes, odors, dusts, gases, and poor ventilation, as well as hazards such as machinery and heights. (Tr. at 566). Dr. Lim concluded that Claimant's "complaint are regarded as not fully credible" and reduced Claimant's RFC to "light work activity

31

with some postural and environmental limitations as noted." (Tr. at 569).

On October 27, 2011, Rogelio Lim, M.D., provided a physical RFC opinion of Claimant. (Tr. at 593-600). Dr. Lim opined that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had unlimited ability to push/pull. (Tr. at 594). Dr. Lim did not include an alternating sit/stand limitation. (*Id.*). Dr. Lim opined that Claimant could never climb ladders, ropes, or scaffolds, but that she could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. (Tr. at 595). Claimant had no manipulative, visual, or communicative limitations. (Tr. at 596-97). Dr. Lim found Claimant's allegations partially credible, noting her "healed fracture w/ORIF" and knee tendinitis, and observing that Claimant "walk[s] with limp but walks without ambulatory aids" and that she has a "history of bulging disc but no neuro findings." (Tr. at 600).

### 2. Mental Evaluations

On July 18, 2011, licensed psychologist Larry J. Legg, M.A., conducted a psychological evaluation of Claimant, consisting of a clinical interview and mental status exam. (Tr. at 571-75). During the interview, Claimant reported suffering from "depression, anxiety, back problems, irritable bowel syndrome, fibromyalgia, high cholesterol, knee problems, and tendinitis." (Tr. at 572). Mr. Legg observed that Claimant's appearance, attitude/behavior, speech, orientation, thought process, thought content, insight, psychomotor behavior, judgment, immediate memory, recent memory, persistence, and pace were all within normal limits or otherwise appropriate, and Claimant denied current suicidal and homicidal ideations. (Tr. at 574). Claimant's mood

was observed as dysphoric, while her affect was flat. (*Id.*). Regarding her perception, Claimant denied current hallucinations or illusions, but reported a "history of auditory hallucinations within the last two weeks." (*Id.*). Claimant's remote memory and her concentration were both judged to be mildly deficient. (*Id.*). Mr. Legg also observed Claimant's social functioning to be within normal limits. (*Id.*).

Claimant reported activities of daily living which consisted of waking up around 5 a.m., preparing coffee and breakfast, doing the dishes, doing laundry, sweeping, mopping, cleaning, and cooking. (*Id.*). Mr. Legg assessed Claimant with "major depressive disorder, recurrent, severe with psychotic features" and "generalized anxiety disorder" along Axis I, "based solely on [his] interview with the claimant." (Tr. at 575). Mr. Legg described Claimant's prognosis as "fair" and opined that Claimant was currently capable of managing her own finances. (*Id.*).

On July 23, 2011, James Binder, M.D., provided a psychiatric review technique of Claimant. (Tr. at 578-91). Dr. Binder assessed Claimant with major depressive disorder and generalized anxiety disorder. (Tr. at 581, 583). Dr. Binder opined that as a result of her mental impairments, Claimant had mild limitations in her activities of daily living, difficulties maintaining social functioning, and difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 588). Accordingly, Dr. Binder opined that the evidence did not establish that Claimant meets any of the relevant Listing criteria. (Tr. at 589). Dr. Binder further noted that Claimant was only "partially credible," as her "claims of difficulty getting along with other[s] noted on ADL form was not supported by mental status exam at the consultative evaluation or reports at the consultative evaluation of having solid relationships with others – girlfriend, boyfriend, children." (Tr. at 590). Furthermore,

Dr. Binder noted that Claimant's "reports of hearing footsteps as a sign of an auditory hallucination is very atypical and suspect." (*Id.*). Thus, Dr. Binder concluded that Claimant has "nonsevere functional limitations from her mental condition, based on mental status exam and ADL's, which are limited by physical factors." (*Id.*).

On October 28, 2011, Jeff Boggess, Ph.D., provided a psychiatric review technique of Claimant, in which he observed that there were "no new psych based allegations or MER on reconsideration" and that "the new AFR is essentially the same as on initial." (Tr. at 614). Accordingly, Dr. Boggess "affirmed, as written" Dr. Binder's psychiatric review technique. (Tr. at 602-15).

On August 21, 2012, licensed psychologist Crystal Knight, M.A., conducted a mental health evaluation, psychiatric review technique, and mental RFC opinion of Claimant, pursuant to referral from Claimant's attorney. (Tr. at 630-59). The mental health evaluation consisted of a clinical interview, mental status exam, intelligence testing, personality testing, depression and anxiety testing, and visual motor testing. (Tr. at 630-39). During the clinical interview, Claimant described her family, education, employment, and medical and psychiatric treatment history. (Tr. at 631-33). Claimant reported symptoms of daily anxiety and depression, a history of past but not current suicidal ideation, past "auditory hallucinations of her boyfriend calling for her," a history of panic attacks and racing thoughts, difficulty sleeping, decreased appetite, poor concentration and difficulty completing tasks that she starts. (Tr. at 633). Claimant's mental status exam reflected that her short term memory was intact, her attention and concentration appeared adequate, her affect was broad, speech was congruent with affect, and she was able to understand and follow instructions. (Tr. at 633-34).

On the Wechsler Adult Intelligence Scale (WAIS-IV), Claimant scored 87, 117,

102, and 106, for verbal comprehension, perceptual reasoning, processing speed, and working memory, respectively, while her full scale IQ was assessed at 106. (Tr. at 634). Claimant's Wechsler Fundamentals Academic Scales test results reflected word reading, reading comprehension, spelling, and numerical operations skills corresponding with grad levels of >12th, 12th, 8th, and 6th, respectively. (Tr. at 635). Claimant's Bender Gestalt Test score was one standard deviation above the mean, and therefore "not suggestive of organic brain syndrome." (*Id.*). Claimant's scores on the Beck Anxiety Inventory (BAI) and the Beck Depression Inventory (BDI-II) placed her in the severe range for both anxiety and depression. (*Id.*). On the Minnesota Multiphasic Personality Inventory (MMPI-2RF), Claimant generated "a considerably larger than average number of infrequent responses," which was noted to correspond with "individuals with genuine, severe psychological difficulties who report credible symptoms" or alternatively with over-reporting from "individuals with no history or current corroborating evidence of severe dysfunction." (Tr. at 636). Claimant provided "an unusual combination of responses" which are "associated with non-credible reporting of somatic and/or cognitive symptoms" and exaggeration, or alternatively with "individuals with substantial medical problem who report credible symptoms." (*Id.*). Claimants also provided "an unusual combination of responses" which are associated with "non-credible memory complaints" and exaggeration, or alternatively with "individuals with significant emotional dysfunction." (*Id.*). Ms. Knight diagnosed Claimant with "major depressive disorder, recurrent, severe" and "generalized anxiety disorder" along Axis I and assigned Claimant a current GAF score of 52. (Tr. at 638). In summary, Ms. Knight observed that Claimant's cognitive functioning fell within the average range, that assessment suggested that Claimant was "experiencing a significant amount of

depression and anxiety," and that her MPI-2-RF was "consistent with her report of depression, anxiety, and difficulty with interpersonal relations. (Tr. at 639). Ms. Knight recommended that Claimant be referred to a psychiatrist to determine if she would benefit from psychotropic medications, and that she receive mental health counseling to address her anxiety and depression. (*Id.*).

In her psychiatric review technique, Ms. Knight diagnosed Claimant with depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, difficulty concentrating or thinking, and thoughts of suicide; and generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, and apprehensive expectation. (Tr. at 649, 651). Ms. Knight opined that as a result of her mental impairments, Claimant had moderate limitations in her activities of daily living; marked difficulties maintaining social functioning, and difficulties maintaining concentration, persistence, or pace; and four or more episodes of decompensation of extended duration. (Tr. at 656). Ms. Knight elaborated that Claimant's "records indicate several periods of decompensation when her medications had to be adjusted or changed." (*Id.*).

## VI.  **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

### A.  Evaluation of Fibromyalgia under SSR 12-2p

Claimant argues that the ALJ "failed to apply the Commissioner's Fibromyalgia Ruling SSR 12-2p" in evaluating Claimant's RFC. (ECF No. 12 at 4-5). Specifically, Claimant argues that the ALJ "omitted severe impairments which were 'signs and symptoms' of fibromyalgia" and "failed to consider the combined impact of the fibromyalgia symptoms." (*Id.* at 4).

Social Security Ruling 12-2p, which took effect on July 25, 2012, provides guidance on the evidence required "to establish that a person has a medically determinable impairment of fibromyalgia" and how to evaluate the limiting effects of the impairment. SSR 12-2p, 2012 WL 3104869, at *5 (2012). Fibromyalgia is "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." *Id.* at *2. In Social Security Ruling 12-2p, the SSA explained that to establish the medically

determinable impairment of fibromyalgia, a claimant must produce a physician diagnosis of fibromyalgia that is adequately supported by medical findings and is not inconsistent with other evidence in the record. *Id.* Relying upon publications of the American College of Rheumatology, the SSA outlined two sets of criteria for diagnosing fibromyalgia, either of which would support a physician's opinion that the impairment was present. Essential to both sets of criteria are (1) findings of widespread pain, "that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back)—that has persisted (or that persisted) for at least three months," and (2) evidence that other disorders that could cause the symptoms and signs had been excluded. *Id.* at *2-3.

The first set of criteria, which is based upon the 1990 ACR Criteria for the Classification of Fibromyalgia, further requires the finding of "at least 11 [out of 18 designated] positive tender points on physical examination," which must be found bilaterally and both above and below the waist. *Id.* at *3. The second set of criteria, which is based upon the 2010 ACR Preliminary Diagnostic Criteria, requires "repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome." *Id.* Under this second diagnostic method, "signs" include certain "somatic symptoms" such as:

> muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath,

> loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms.

SSR 12-2p, 2012 WL 3104869, at *3 n.9. "Co-occurring conditions" include irritable bowel syndrome and depression, as well as "anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome." *Id.* at *3 n.10.[3]

Thus, in order to establish fibromyalgia as a medically determinable impairment under the second diagnostic criteria, a claimant must provide objective medical evidence establishing (1) a history of widespread pain, (2) repeated manifestations of six or more of the listed "somatic symptoms" or co-occurring symptoms, and (3) evidence excluding other disorders that could cause the repeated manifestations. *Id.* at *3. As the SSA explains, "[w]hen a person alleges fibromyalgia, longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment." *Id.* Once fibromyalgia has been established as a medically determinable impairment, the SSA will "follow the two-step process set forth in [the] regulations and in SSR 96-7p" to determine the Claimant's resulting functional limitations. *Id.* at *5.

Here, the ALJ determined that Claimant's fibromyalgia was a severe impairment, but found that her irritable bowel syndrome, gastritis, gastroesophageal reflux disease, depression, and anxiety were all nonsevere. (Tr. at 18). Claimant appears to argue that these additional impairments should have been deemed severe, and that the ALJ's failure to do so "erroneously fragmentized the co-existing conditions and somatic symptoms of the fibromyalgia syndrome," contrary to SSR 12-2p. (ECF No. 12 at 5).

---

[3] Both the somatic symptoms and co-occurring conditions are taken from Table No. 4, "Fibromyalgia diagnostic criteria," in the 2010 ACR Preliminary Diagnostic Criteria. *Id.* at *3 n.9 and 10.

Claimant further argues that the ALJ's error "resulted in a failure to find any significant postural, manipulative, environmental, and mental limitations or any limited effect on sustained work functions," and therefore urges the District Court to invalidate her subsequent RFC finding and finding regarding past relevant work. (*Id.*).

Claimant misreads SSR 12-2p. Under the ruling, fibromyalgia may be established as a medically determinable impairment with evidence of symptoms, signs, and co-occurring conditions such as irritable bowel syndrome, gastritis, gastroesophageal reflux disease, depression, and anxiety. SSR 12-2p, 2012 WL 3104869, at *3. However, SSR 12-2p does not advise, nor does it logically follow, that finding fibromyalgia to be a severe impairment would necessarily imply that all accompanying somatic symptoms and co-occurring conditions also constitute severe impairments, either individually or in combination. Claimant insists that her IBS, gastritis, GERD, depression, and anxiety constituted a severe combination of impairments, but fails to support this claim with any reference to the record or other medical evidence. Indeed, the record supports the ALJ's determination that these impairments, either individually or in combination, were nonsevere. (Tr. at 18-19). Aside from the notations of gastrointestinal difficulties occurring in March 2007, Claimant's medical records are void of any prior or subsequent complaints or treatment for gastrointestinal problems. Moreover, during the administrative hearing, Claimant admitted that she had not been treated for stomach-related problems in approximately five years. Similarly, although Claimant was diagnosed with depression and anxiety, she received only conservative mental health treatment for two relatively brief periods of time, from April 2005 to January 2006, and March 2009 to October 2009, during which her mental status examinations were largely unremarkable, while treatment notes indicate that her mood improved with

medication. Furthermore, both agency evaluators provided psychiatric review techniques opining that Claimant's mental impairments were nonsevere, and Claimant herself testified that Cymbalta was useful in decreasing her symptoms of crying and anxiety. (Tr. at 48-49). The ALJ acknowledged that Claimant had the medically determinable impairment of fibromyalgia and found it to be a severe impairment; therefore, Claimant's criticism is entirely without merit. Accordingly, the undersigned **FINDS** no error in the ALJ's application of SSR 12-2p.

### B. Assessment of Claimant's RFC

Claimant argues that the ALJ's RFC assessment is unsupported by substantial evidence for "failure to include any limitations expected to narrow the range of light work" that Claimant was capable of performing. (ECF No. 12 at 6). Specifically, Claimant argues that the ALJ should have included an alternative sit/stand option; various postural limitations; limitations in reaching, handling, and fingering; and limitations relating to dealing with public, coworkers, and supervisors. (ECF No. 12 at 5-9). After reviewing the relevant medical and evaluative evidence, the undersigned agrees that the ALJ's RFC assessment is not supported by substantial evidence. Although the ALJ did demonstrate and adequately explain the bases for rejecting a sit/stand option and the Claimant's alleged manipulative and psychological limitations, the ALJ failed to adequately explain her exclusion of all postural limitations. Indeed, the ALJ provided no focused discussion of the medical source opinions that unanimously found Claimant to be limited in one or more postural functions, with the two most recent agency evaluators agreeing that Claimant was limited in *all* postural functions. (Tr. at 564, 595). Consequently, some discussion and reconciliation of this evidence was necessary.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [she] receive[s]." 20 C.F.R. § 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite [her] impairment(s), and [her] physical or mental restrictions." *Id.* § 416.927(a)(2). However, the determination of an individual's RFC is an issue reserved to the Commissioner. *Id.* § 416.927(d)(2). Thus, medical source opinions regarding a Claimant's RFC are never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled."[4] SSR 96-5p, 1996 WL 374183, at *2. However, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.*

> If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record. In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 CFR 404.1527(d) and 416.927(d).[5]

---

[4] Examples of issues reserved to the Commissioner include "(1) whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings; (2) what an individual's RFC is; (3) whether an individual's RFC prevents him or her from doing past relevant work; (4) how the vocational factors of age, education, and work experience apply; and (5) whether an individual [is unable to work or] is 'disabled' under the Social Security Act." SSR 96-5p, 1996 WL 374183 at *2.

[5] The applicable factors are now found in 20 C.F.R. §§ 404.1527(c), 419.927(c).

*Id.* at *3.

That is, the ALJ will generally give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. 20 C.F.R. § 416.927(c)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 416.927(c)(2). However, the ALJ must analyze and weigh all medical source opinions in the record, including those of non-examining sources. *Id.* C.F.R. § 416.927(e). Relevant factors include: (1) length of the treatment relationship and frequency of evaluation; (2) nature and extent of the treatment relationship, (3) degree to which an opinion is supported by relevant evidence and explanations; (4) consistency of an opinion with the record as a whole, (5) whether the source is a specialist in the area relating to the rendered opinion; and (6) any other factors which tend to support or contradict the opinion, including "the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record. *Id.* § 416.927(c)(2)-(6).

If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions. *See Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995). A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review," given that "when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d. 700, 705 (3rd Cir. 1981)). In the context of determining an individual's RFC, the ALJ must always consider and

address medical source opinions, and "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7. Ultimately, it is the responsibility of the ALJ, rather than the court, to evaluate the case, make findings of fact, resolve conflicts of evidence, *Hays*, 907 F.2d at 1456, and provide good reasons in the written decision for the weight given to the opinions. 20 C.F.R. § 416.927(e)(2)(ii).

Here, the ALJ determined that Claimant was capable of performing the full range of light work under 20 C.F.R. § 416.967(b). (Tr. at 20). Regarding a possible sit/stand option, the ALJ specifically found that there was "little to no support for the claimant's alleged limitations in her ability to sit, stand and walk," and noted that Claimant "acknowledged being able to maintain a household as well as care for her two young grandchildren," and described "a wide range of daily activities that show a greater ability to do work related activity than alleged." (Tr. at 23). Claimant does not contest the ALJ's observations regarding her activities of daily living, but argues that a sit/stand option is supported by her spine and knee diagnoses, as well as the RFC opinions of treating physician Dr. Wehrheim and consultative physician Dr. Egnor. (ECF No. 12 at 7). The relevant inquiry, however, is not whether there is support for such a limitation, but whether the ALJ's RFC assessment is supported by substantial evidence. Here, the ALJ discounted Dr. Wehrheim's opinion as "inconsistent with the overall treatment records from Clay Primary Care Systems that show the claimant has increased ability" since the date of her assessment. (Tr. at 25). Furthermore, although Dr. Egnor recommended a "sit/stand option every 2 hours as needed for pain relief," (Tr. at 563), none of the other consultative physicians, including Dr. Gomez, Dr. Boukhemis, or Dr. Lim opined that Claimant required a sit/stand option. (Tr. at 317-24, 392-99, 593-600). The ALJ's

omission of a sit/stand option is therefore supported by substantial evidence on the record.

Regarding a limitation on reaching, handling, and fingering, Claimant argues that a limitation on reaching, handling, and fingering is supported in the record by a history of cervical disc disease, diagnoses of carpal tunnel syndrome and hand DJD, evidence of muscle spasms, pain and numbness in her arms. (ECF No. 12 at 7-8). However, the undersigned notes that despite Claimant's earlier assessments of carpal tunnel syndrome and osteoarthritis/DJD of the hands, (Tr. at 468, 470, 492-93), a subsequent EMG of her hands was entirely normal. (Tr. at 539-40). Furthermore, none of the physical RFC opinions, including those of Dr. Wehrheim or Dr. Egnor, (Tr. at 421-23, 562-69), nor of Dr. Gomez, Dr. Boukhemis, or Dr. Lim included any manipulative limitations. (Tr. at 317-24, 392-99, 593-600). Thus, there is substantial evidence upon which to conclude that Claimant has no significant manipulative limitations.

As for her mental impairments, Claimant argues that the ALJ improperly omitted "any limitations in dealing with the public, coworkers and supervisors, a need for special supervision and inappropriate response to supervision and work stress." (ECF No. 12 at 8). Claimant argues that these limitations are supported by the treatment records of Dr. Patalinjug, as well as the psychological evaluations of psychologists Mr. Legg and Ms. Knight. (*Id.*). However, the ALJ explicitly discounted the evaluation of Mr. Legg, as "his diagnosis was based solely on his interview with the claimant." (Tr. at 23, 575). Similarly, the ALJ devoted considerable attention to explaining her rationale for "accord[ing] little weight to Ms. Knight's findings," which were "inconsistent with the medical record of evidence including records from the claimant's treating source indicating she was doing well a month earlier." (Tr. at 26). The ALJ further observed

that Ms. Knight "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to accept uncritically as true most, if not all of what the claimant reported." (*Id.*). As the ALJ pointed out, the evidence on record "strongly suggest[s] that the claimant has exaggerated symptoms and limitations;" consequently, Ms. Knight's opinions were unreliable. (Tr. at 24).

Although the record does contain evidence of ongoing complaints of depression and anxiety, the ALJ duly noted that there are "significant gaps in the claimant's history of treatment suggesting that the symptoms may not have been as serious as had been alleged in connection with this application and appeal." (Tr. at 23). Between April 2006 and January 2006, Claimant attended monthly psychiatric appointments, during which her condition was observed as "improved" with medication adjustments, and between March 2009 and October 2009, Claimant again attended nearly monthly psychiatric appointments, during which Claimant's condition was observed as "improved" and "stable with Cymbalta." (Tr. at 341-72). At the administrative hearing, Claimant reported that Cymbalta helped her with her crying spells, (Tr. at 48), and in July 2012, Claimant reported that she was "doing well" and experiencing "better relationships with [her] daughter [and boyfriend." (Tr. at 628). Aside from her mood and affect, Claimant's mental status examinations were consistently observed to be within normal limits. As the ALJ noted, Claimant's WAIS-IV and Bender Gestalt tests were unremarkable, while her MMPI-2RF responses "could be a sign of over-reporting and in some cases also reflect 'exaggeration.'" (Tr. at 24). The ALJ did not err in relying upon the opinions of consultative evaluators Dr. Binder and Dr. Boggess to determine that Claimant's mental impairments were nonsevere, as their opinions are consistent with the evidence on record. Accordingly, there is ample support on the record for the ALJ's finding "that

alleged limitations in the claimant's ability to process information, concentration, or understand instructions is not supported by the record or intelligence testing administered." (Tr. at 25).

On the other hand, the ALJ failed entirely to address any potential postural limitations resulting from Claimant's impairments. Unlike Claimant's assertions regarding hand limitations, significant objective evidence exists supporting the likelihood of postural limitations, beginning with the nature of Claimant's severe impairments, which include disc disorders and disease of the neck and back, status post fractures of the knees, and fibromyalgia. (Tr. at 18). Although the ALJ gave no credence to Claimant's statements that she could not bend, stoop, or crawl, it seems probable that longstanding musculoskeletal conditions of the back and neck, and fractures of both knees requiring the placement of hardware, would have some negative impact on an individual's ability to bend, kneel, crawl, crouch, and climb. Moreover, all of the RFC opinions provided by the consultative evaluators include various postural limitations. Dr. Gomez opined that Claimant was limited to occasional climbing of ladders, ropes, and scaffolds; and frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (Tr. at 319). Dr. Boukhemis opined that Claimant could frequently balance, stoop, or kneel; but could only occasionally climb, crouch, or crawl. (Tr. at 394). Dr. Egnor opined that Claimant could only occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. at 564). Dr. Lim determined that Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ropes, scaffolds, and ladders. (Tr. at 595).  These opinions comport with the findings of consultative examiner Dr. Khorshad, (Tr. at 556-60), as well as Claimant's treating physician Dr. Wehrheim. (Tr. at 421-25). Thus, even assuming the ALJ

discounted treating physician Dr. Wehrheim's opinion that Claimant was "unable to lift, kneel, stoop, [or] squat on a regular basis," (Tr. at 422), the ALJ should have more fully addressed the opinions of the consultative evaluators. *See* SSR 96-5p, 1996 WL 374183, at *5 ("Adjudicators must weigh medical source statements. . . providing appropriate explanations for accepting or rejecting such opinions."); SSR 96-8p, 1996 WL 374184, at *7. Unfortunately, the written decision never clarifies why the ALJ chose to disregard *all* of the medical source opinions regarding Claimant's postural limitations.

At one place in her analysis, the ALJ did state that "objective findings do not support the extreme limitations alleged by the claimant," (Tr. at 22), noting that the medical imaging shows only mild disc bulging, and also confirms that the hardware in Claimant's knees is "well-positioned." The ALJ further pointed to a few notations in the medical records that suggests Claimant's pain is controlled and her mobility and function are normal. (*Id.*). Later in the written opinion, the ALJ afforded "some weight" to the findings of Dr. Egnor and Dr. Lim. (Tr. at 25). However, there is no discussion addressing which aspects of Claimant's allegations or limitations the ALJ was discounting, or what, if any, specific postural limitations were considered. *See DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983) ("Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator."). The ALJ simply failed to explain how she reconciled the considerable evidentiary weight of the medical source opinions corroborating postural limitations with her RFC finding rejecting all such limitations. Having failed to sufficiently articulate the reasons for not including any postural limitations, the ALJ's RFC assessment is not supported by substantial evidence.

48

Accordingly, the undersigned respectfully **RECOMMENDS** that the District Court **FIND** that the ALJ's RFC assessment is not supported by substantial evidence given that the ALJ did not sufficiently address and resolve the evidence regarding Claimant's postural limitations. The undersigned further **RECOMMENDS** that the decision of the Commissioner be **REVERSED** and **REMANDED** to determine (1) the nature and extent of Claimant's postural limitations, if any, and (2) whether Claimant is capable of performing a full range of light level exertional work in light of her nonexertional limitations.

### C. Past Relevant Work

Claimant argues that the ALJ's determination that she could return to past relevant work as a cashier is unsupported by substantial evidence on the record for failure to perform the requisite analyses under SSR 82-61 and SSR 82-62. (ECF No. 12 at 9).

Under the fourth step of the sequential evaluation process, the ALJ must determine a claimant's RFC, and in turn ascertain whether the claimant is capable of performing past relevant work. 20 C.F.R. § 416.920(a)(iv). Past relevant work is "work that [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the individual] to learn to do it." 20 C.F.R. § 416.960(b)(1); *see also* 20 C.F.R. § 416.965(a); *Connolly v. Bowen*, No. 88-3116, 1989 WL 79726, at *2 (4th Cir. Jul. 14, 1989) (holding that "in order to be classified as past relevant work, for the purpose of determining disability, the work must have been substantial gainful activity").

Social Security Ruling 82-61 and Social Security Ruling 82-62 both provide guidance as to how the ALJ determines whether a Claimant is capable of doing past

relevant work. Social Security Ruling 82-61 cautions that "finding that a claimant has the capacity to do past relevant work on the basis of a generic occupational classification of the work is likely to be fallacious and unsupportable." SSR 82-61, 1982 WL 31387, at *1 (S.S.A. 1982). Instead, the ALJ must determine if "the evidence shows that a claimant retains the RFC to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it," or in the alternative "if the claimant cannot perform the excessive functional demands and job duties as generally required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy." *Id.* at *2. If so, then the claimant should be found "not disabled." *Id.* However, SSR 82-61 cautions that "composite jobs have significant elements of two or more occupations and, as such, have no counterpart in the [Dictionary of Occupational Titles]" and therefore must be "evaluated according to the particular facts of each individual case." *Id.*

Under Social Security Ruling 82-62, in order to find that a claimant can perform a past relevant job, the ALJ's decision "must contain among the findings the following specific findings of fact: (1) A finding of fact as to the individual's RFC. (2) A finding of fact as to the physical and mental demands of the past job/occupation. (3) A finding of fact that the individual's RFC would permit a return to his or her past job or occupation." SSR 82-62, 1982 WL 31386, at *4 (S.S.A. 1982); *see also Harris v. Secretary, Dep't of Health and Human Servs.*, No. 88-3113, 1989 WL 7013, at *2 (4th Cir. 1989) (holding that the ALJ "must determine precisely the activities involved in the claimant's former job or activities and the activities that the claimant is capable of performing"). SSR 82-62 further instructs that "[t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are

generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." SSR 82-62, 1982 WL 31386, at *3. Thus, the ALJ must engage in careful appraisal of:

> (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy.

*Id.* "The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision." *Id.* Furthermore, "an ALJ's duty to further develop the record concerning a claimant's past relevant work arises when the ALJ is alerted by the record to the presence of an issue on the subject of past relevant work." *Adams v. Colvin*, No. 2:13–cv–00019–FDW–DSC, 2014 WL 1713775, at *8 (W.D.N.C. May 1, 2014) (quoting *Floyd v. Astrue*, No. 3:10-cv-474, 2011 WL 4946311, at *4 (W.D.N.C.  Jun. 6, 2011)).

In this case, the ALJ determined that Claimant is "capable of performing past relevant work as a cashier," and that "[t]his work does not require the performance of work related activities precluded by the claimant's residual functional capacity." (Tr. at 26). However, the ALJ's determination that Claimant can perform past relevant work does not comply with SSR 82-62, as the ALJ failed to make a finding of fact as to the physical and mental demands of her past jobs. Although Claimant listed prior jobs as a "Deli Cashier," the only description of cashier work she provided was that she would "run [a] register." (Tr. at 222-24). Additionally, it appears from her description of prior jobs that register work comprised only a portion of her job duties and requisite

51

functions, which also consisted of lifting gallons of water, coolers, and large ice bags, as well as carrying deli trays and other food items, serving food, stocking shelves and coolers, and both sweeping and mopping. (Tr. at 183-87, 220-24). As the vocational expert testified, however, the work of a deli prep worker, deli stock clerk, and cook are all considered medium exertional work, whereas the job of a cleaner or janitor is considered light to medium work. (Tr. at 67). In light of the ALJ's determination that Claimant was limited to light exertional work, it does not appear that she is capable of performing her past relevant work as it was actually performed.

Moreover, it is not at all clear that Claimant would be able to perform cashier duties as they are generally performed in the national economy. At the administrative hearing, the vocational expert testified that cashier work is considered to be a "light, SVP 2, unskilled" job. (Tr. at 67). Nevertheless, neither the ALJ nor the vocational expert elaborated as to the specific job functions required of a cashier as generally performed in the national economy. The Dictionary of Occupational Titles includes several listings for the position of cashier, which have slightly different requirements. As discussed above, the ALJ's finding as to Claimant's RFC is not supported by substantial evidence on the record. *See supra* Part VII.B. When considering that Claimant's RFC may very well be restricted to less than a full range of light work, the ALJ's determination as to Claimant's ability to perform past relevant work must also be reevaluated in light of her new RFC assessment.

Because the ALJ did not engage in adequate analysis or make sufficient findings of fact as to the physical and mental demands of Claimant's past relevant jobs, the undersigned cannot determine if the Commissioner's decision is supported by substantial evidence. Accordingly, the undersigned respectfully **RECOMMENDS** that

the District Court **FIND** that the ALJ's decision does not comply with requirements of SSR 82-61 and SSR 82-62, and that the decision be **REVERSED** and **REMANDED** to the Commissioner to determine whether Claimant is capable of performing past relevant work as it was actually performed, or as it is generally performed in the national economy.

In summary, on remand, the ALJ should (1) reassess Claimant's RFC with respect to any postural limitations, (2) make specific findings as to the mental and physical demands required of Claimant in her past relevant work as a cashier,[6] both as she actually performed it, and as generally performed in the national economy, and (3) determine whether Claimant's RFC would permit her to return to her prior job or to cashier work as it is generally performed nationally. *See* SSR 82-62, 1982 WL 31386, at *4.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Plaintiff's motion for summary judgment, (ECF No. 11); **DENY** Defendant's Motion for Judgment on the Pleadings (ECF No. 15), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings in accordance with the findings and recommendations

---

[6] Additionally, Claimant argues that her prior work as a deli cashier does not qualify as past relevant work on the grounds that it is neither relevant in terms of duration, nor does it constitute substantial gainful activity, given that she worked those jobs only very briefly, and approximately 14 to 15 years prior to the date of the ALJ's decision. (ECF No. 12 at 10). This issue was raised by Claimant's counsel at the administrative hearing, (Tr. at 74), yet the ALJ apparently determined without explanation that Claimant's past work was both relevant and constituted substantial gainful activity. On remand the ALJ may wish to address whether Claimant's prior work as a deli cashier constitutes past relevant work under the fourth step in the sequential evaluation process.

herein; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** May 19, 2014.

Cheryl A. Eifert
United States Magistrate Judge